# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America | Case No.: 25-3438 MJ |
| v. | **CRIMINAL COMPLAINT**<br>**(Electronically Submitted)** |
| Brian De La Torre | |

I, the undersigned complainant, being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

### COUNT 1 (Knowingly Receiving Child Pornography)

On or between March 6, 2025 – May 16, 2025, in the District of Arizona and elsewhere, Defendant Brian De La Torre did knowingly receive a visual depiction that involved the use of a minor engaging in sexually explicit conduct and such visual depiction was of such conduct. The visual depiction was transported using any means and facility of interstate commerce. Four files received include Video_4@16-05-2025_22-43-22, Video_9@16-05-2025_22-43-22, Video_61@16-05-2025_22-43-24, and Video_69@16-05-2025_22-43-24. This was all in violation of 18 U.S.C. §2252(a)(2), (b)(1), and 2256.

### COUNT 2 (Knowingly Distributing Child Pornography)

On or about October 20, 2025, in the District of Arizona and elsewhere, Defendant Brian De La Torre did knowingly distribute a visual depiction that involved the use of a minor engaging in sexually explicit conduct and such visual depiction was of such conduct. The visual depiction was transported using any means and facility of interstate commerce. Two files distributed include video_168@20-10-2025_30-34-14 and video_170@20-10-2025_03-34-14. This was all in violation of 18 U.S.C. §2252(a)(2), (b)(1), and 2256.

### COUNT 3 (Knowingly Possessing Child Pornography)

On or between March 6, 2026 – October 20, 2025, in the District of Arizona and elsewhere, Defendant Brian De La Torre did knowingly possess and access with intent to view a visual depiction that involved the use of a minor engaging in sexually explicit conduct and such visual depiction was of such conduct. The visual depiction was transported using any means and facility of interstate commerce and the producing of the visual depiction involved the use of a minor engaging in sexually explicit conduct and such visual depiction of such conduct. Six files possessed include Video_4@16-05-2025_22-43-22, Video_9@16-05-2025_22-43-22, Video_61@16-05-2025_22-43-24, and Video_69@16-05-2025_22-43-24video_168@20-10-2025_30-34-14 and video_170@20-10-2025_03-34-14. This was all in violation of 18 U.S.C. §2252(a)(4)(B), (b)(2), and 2256.

I further state that I am a Special Agent from the FBI and that this complaint is based on the following facts:

**See Attached Statement of Probable Cause Incorporated By Reference Herein.**

Continued on the attached sheet and made a part hereof:    ☒ Yes    ☐ No

AUTHORIZED BY: _s/Gayle L. Helart_, AUSA    GAYLE HELART Digitally signed by GAYLE HELART Date: 2025.11.06 13:58:01 -07'00'

Amber Lytton, Special Agent, FBI
Name of Complainant

AMBER LYTTON Digitally signed by AMBER LYTTON Date: 2025.11.06 13:54:28 -07'00'

Signature of Complainant

Telephonically Sworn to and subscribed

___November 6, 2025___    at    Phoenix, Arizona
Date                                                    City and State

HONORABLE MICHAEL T. MORRISSEY
United States Magistrate Judge
Name & Title of Judicial Officer

M Morrissey
Signature of Judicial Officer

## Attachment A

## Statutes

### Counts 1 - 2:  Distributing or Receiving Child Pornography

It shall be unlawful for any person who knowingly distributes or receives any visual depiction using any means or facility of interstate or foreign commerce by any means including by computer if the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

A violation of 18 U.S.C. §§ 2252(a)(2), (b)(1), and 2256 is punishable by 5-20 years' imprisonment, $250,000 fine, and between 5 years to lifetime supervised release.

### Count 3 Possession and Access with Intent to View Child Pornography

It shall be unlawful for any person to knowingly possess and access with intent to view a visual depiction that involved the use of a minor engaging in sexually explicit conduct and such visual depiction was of such conduct.  The offense involved a minor who had not attained the age of 12.  The visual depiction was transported using any means and facility of interstate commerce and the producing of the visual depiction involved the use of a minor engaging in sexually explicit conduct and such visual depiction of such conduct

A violation of 18 U.S.C. §§ 2252(a)(4)(B), (b)(2) and 2256  is punishable by up to 20 years imprisonment, $250,000 fine, and between 5 – lifetime supervised release.

## ELECTRONICALLY SUBMITTED AFFIDAVIT IN
## SUPPORT OF SEARCH WARRANT and ARREST WARRANT

I, Amber Lytton, Special Agent with the Federal Bureau of Investigation (FBI), being first duly sworn, hereby depose and state as follows:

## INTRODUCTION

The facts of this case, as more fully detailed herein, are that between approximately March 6, 2025 and October 20, 2025, an adult male identified as Brian De La Torre (De La Torre) (DOB XX/XX/1999), age 26, a resident of Mesa, Arizona, knowingly distributed and received visual depictions of minor boys under age 18 engaged in sexually explicit conduct, i.e. child pornography. De La Torre's conduct was originally observed by law enforcement following the arrest of an adult male from whom De La Torre had received child pornography files. De La Torre and the other adult male communicated through Telegram, an encrypted social media platform that is accessed via the Internet, that allows its users to send files of all kinds to each other including text, image, and video files. Following this determination, an undercover officer communicated with De La Torre and De La Torre distributed files of child pornography to the undercover officer.

I am now seeking to search De La Torre's residence, De La Torre's person, and De La Torre's vehicle, for cellular telephones, computers, and computer media for evidence, fruits, and instrumentalities in violation of 18 U.S.C. § 2252(a)(2) (knowingly distributing and receiving child pornography); and § 2252(a)(4)(B) (possessing and accessing with intent to view child pornography), which items are more specifically described in Attachment B of this Affidavit, to include computers, cellular telephones, and electronic storage devices to locate child pornography and evidence of the child exploitation offenses developed in this investigation.

By this affidavit, I am also seeking an arrest warrant for Brian De La Torre for violations of Knowingly Distributing and Receiving Child Pornography (18 U.S.C. §2252(a)),and Possessing and Accessing with Intent to View Child Pornography (2252(a)(4)(B)).

1

## PRELIMINARY BACKGROUND INFORMATION

1.      I am a Special Agent with the Federal Bureau of Investigation assigned to the Phoenix Division. I have been so employed since 2016 and I am specifically assigned to conduct investigations pursuant to the FBI's Innocent Images National Initiative (IINI), which focuses on crimes where computers and the Internet are used in the sexual exploitation of children. I am responsible for conducting federal and international investigations relating to crimes involving the sexual exploitation of children. I have received basic and on-the-job training in the investigation of cases involving the sexual exploitation of children. I am familiar with the definition of child pornography under federal law as it is defined under 18 U.S.C. § 2256, and I am familiar that child pornography is also referred to as Child Sexual Abuse Material (CSAM). The statements contained in this Affidavit are based on my experience and background as a Special Agent and on information provided by other law enforcement agents.

2.      The purpose of this application is to seize evidence, more particularly described in Attachment B, of violations of 18 U.S.C. § 2252(a)(2) (knowingly distributing and receiving child pornography); and § 2252(a)(4)(B) (possessing and accessing with intent to view child pornography). Further, this application supports the arrest of Brian De La Torre for violations of Knowingly Distributing and Receiving Child Pornography (18 U.S.C. §2252(a)); and § 2252(a)(4)(B) (possessing and accessing with intent to view child pornography).

3.      I have set forth sufficient facts to establish probable cause from this investigation to believe that evidence of violations of 18 U.S.C. §§ 2252(a)(2) (knowingly distributing and receiving child pornography); and § 2252(a)(4)(B) (possessing and accessing with intent to view child pornography), is located at:

The residence at                            Mesa, AZ 85202 occupied by De La Torre, more particularly described in Attachment A of the residential search warrant, including within cellular telephones, computers, computer storage media, found at the residence;

2

The person of De La Torre, including cellular telephones, computers, and computer storage media, more particularly described in Attachment A of the Person Warrant; and

The vehicle De La Torre has been observed driving, registered to ▮▮▮▮ De La Torre, of the same address, --a dark colored Acura MDX with AZ License Plate ▮▮▮▮ --for cellular telephones, computers, and computer media more particularly described in Attachment A of the Vehicle Warrant; for the things described in Attachment B.

By this affidavit, I have also set forth sufficient facts that De La Torre is the person responsible for distributing and receiving child pornography in violation of 18 U.S.C. § 2252(a)(2) (knowingly distributing and receiving child pornography); and § 2252(a)(4)(B) (possessing and accessing with intent to view child pornography), and so I seek authorization for an arrest warrant for De La Torre.

## STATUTORY AUTHORITY

4.     This investigation concerns alleged violations of Title 18, United States Code, Section 2252 related to material involving the sexual exploitation of minors.

a.     18 U.S.C. § 2252(a)(2), in summary, prohibits a person from knowingly distributing or receiving a visual depiction if the producing of such visual depiction involved the use of a minor engaging in sexually explicit conduct and such visual depiction was of such conduct, using any means of interstate commerce, including by computer.

b.     18 U.S.C. § 2252(a)(4)(B), in summary, prohibits a person from knowingly possessing or accessing with intent to view, any matter which contains any visual depiction if the producing of such visual depiction involved the use of a minor engaging in sexually explicit conduct and such visual depiction was of such conduct, that has been transported using any means or facility of interstate commerce, including by computer.

## TELEGRAM

5.     Telegram is an internet-based messaging and social-media application for smartphones, tablets, and computers.  Its servers are worldwide but its headquarters are in

3

Dubai, United Arab Emirates. A user who wants a Telegram account requires a phone number. Once an account is registered with a phone number the user chooses a custom username. Messages are then tied with that phone number and username Users can transmit messages, photos, videos, and other types of files with one another. Users can also create and participate in "groups" which allow numerous users to exchange messages and files, including photos and videos. Telegram uses encryption properties to foster privacy and security in messaging.

## DETAILS OF INVESTIGATION

6.    In the following investigative details, all initials, subject references, and redacted DOB's references refer to persons and dates that are known to law enforcement. All dates are on or about those dates. All ages are estimated. All numbers of files are best estimates.

7.    This investigation was first referred to Phoenix-FBI from New York-FBI. On May 29, 2025, FBI New York's Child Exploitation and Human Trafficking Task Force executed a search warrant of an offender (hereafter NY Offender, and full identifiers known to law enforcement), and his residence located in New York, NY for evidence of the distribution and receipt of child pornography. NY Offender operated a Telegram account with a display name known to law enforcement and a username known to law enforcement, all collectively referred to herein for simplicity as the NY Offender. The NY Offender used his Telegram account to trade child pornography (also called CSAM) with others. From the investigation, it was believed that the other Telegram users who communicated with NY Offender about their interest in trading child pornography originally found the NY Offender's Telegram account via X (formerly Twitter). NY Offender consented to the FBI assuming the online identity of his Telegram account.

8.    On or about May 29, 2025, an FBI Online Covert Employee (OCE) accessed the NY Offender's Telegram account and observed two communications by Telegram user with the display name "lucas" (Telegram User ID 7953106442) and the NY Offender. Specifically, the OCE saw that on March 6, 2025, lucas contacted the NY Offender on Telegram by stating, "hey" and "you trade?" There were no other messages

4

in the NY Offender's account between the two accounts; however, two and one-half months later, on May 16, 2025, the NY Offender sent lucas 189 video files containing CSAM that depicted male and female children, some of whom appeared to be infants and toddlers, engaged in sexual positions and sexual conduct, including bondage, with adults and other children. I have seen the 189 video files that were sent to lucas. The video files depict various prepubescent children (overwhelmingly boys) and teenage boys engaged in sexual activity. I saw 73 videos depicting prepubescent boys to pubescent aged boys masturbating; 35 videos of prepubescent to pubescent aged boys engaging in sexual activity together; 17 videos depicting prepubescent and pubescent aged boys exposing their genitals and anuses, without other sexual activity; and 26 videos depicting adults performing various sexual acts on prepubescent to pubescent aged boys. Four of the video files that I saw can be described as:

> **Video_4@16-05-2025_22-43-22** is a 55 second video depicting a naked boy, whose diaper can be seen within the frame of the video, laying next to an adult male who is masturbating and then ejaculates on the stomach of the child.

> **Video_9@16-05-2025_22-43-22** is a 44 second video depicting what appears to be a sleeping, toddler age boy, wearing a long sleeve pajama top and a diaper, with an adult masturbating over him and putting the adult penis in the mouth of the child. At approximately 38 seconds into the video, the child's sleep is almost disrupted, and the child rolls away from the adult, towards whomever is recording the video.

> **Video_61@16-05-2025_22-43-24** is a 41 second video depicting a prepubescent boy engaging in oral sex with an adult male that is balding, with white hair.

> **Video_69@16-05-2025_22-43-24** is two minute and 56 second compilation video depicting primarily prepubescent boys engaged in various sexual activity, to include masturbation, group masturbation, oral sex, anal penetration, and at two minutes and 26 seconds into the video, a male is depicted with a small body on top of his chest, wearing a blue onesie, as confirmed by the snaps at the bottom of the article of clothing, which are near the bottom of the child, and a penis is inserted into the anus of the child.

9. FBI agents in New York took further steps to learn the identity of the "lucas" account. The subscriber information for the "lucas" account revealed that the user utilized telephone number ███████-8843 and an IP address of 38.13.122.74 on June 16, 2025 at 23:26 UTC to access Telegram. A search for the IP address indicated that 38.13.122.74 at that date and time was associated with a USA Millenium Telecom account. New York-FBI served an administrative subpoena to USA Millenium Telecom who responded to the subpoena and provided the following subscriber information for IP address 38.13.122.74 during the relevant date and time:

Name: ██████ Estrada

Address: ███████████████ Mesa AZ 85202

10. New York-FBI also served an administrative subpoena to T-Mobile, the cellular network provider for telephone number ███████-8843. T-Mobile responded to the subpoena and provided the following subscriber information:

Name: Brian De La Torre

Address: ███████████████ Mesa AZ 85202

11. A search of Arizona Motor Vehicle Division (AZ MVD) resulted in a current driver record for Brian De La Torre, being associated with a residential address of ████ ███████████████ Mesa AZ 85202, which is the same residence as De La Torre was observed leaving on October 30, 2025 and October 31, 2025, and get into an Acura vehicle.

12. Based on the registration of the IP addresses, the subscriber information for the telephone number associated with the Telegram account, and the AZ MVD information, there is probable cause to believe that the user of the "lucas" Telegram account is Brian De La Torre (hereinafter De La Torre).

### *Communications between the OCE and lucas (De La Torre) on Telegram beginning on August 18, 2025*

13. Starting on August 18, 2025, the FBI OCE continued the investigation. The OCE initiated a conversation with De La Torre (with his Telegram "lucas" account) utilizing the account takeover of the NY Offender. All of their communications were:

**August 18, 2025**

OCE:  hey

OCE:  anything new to trade?

**August 19, 2025**,

lucas:  yeah

OCE:  any gay twinks?[1]

**August 20, 2025**

lucas:  just yngr ones

lucas:  wbu?

OCE:  what are you looking for?  a lot of my new collection is girls

**August 21, 2025**

lucas:  not into girls

14.	The OCE did not respond to De La Torre until October 8, 2025 when the OCE asked, again, if De La Torre had any new material to trade

**October 8, 2025**

OCE:  trade?  I have new daddy son stuff now

**October 15, 2025**

lucas:  what do you have?

OCE:  this dad im talking to sends me stuff of his boy

OCE:  what do you have?

**October 20, 2025**

lucas:  i have tons of other videos

lucas:  of younger boys

lucas:  let's trade

De La Torre proceeded to send 59 video files to the OCE.  De La Torre asked for material in exchange for what was sent as follows:

lucas:  show me what u got

---

[1] I am familiar that "twinks" is a term used by those with a sexual interest in prepubescent age boys.

OCE: hot

OCE: I like the bathtub one

OCE: these are ok

OCE: do you have younger though?

lucas: i do

lucas: but can i see some videos first?

**October 22, 2025**

OCE: whats your mega?[2] i keep all my new stuff on there

OCE: ill share you on my daddy son folder

**October 23, 2025**

lucas: i don't have mega

15.     The OCE did not send any files to De La Torre.  I viewed the 59 files that De La Torre sent to the OCE.  I observed that the files depicted prepubescent children and teenage boys engaged in sexual activity.  There were 15 videos depicting prepubescent boys to pubescent aged boys masturbating; 18 videos of prepubescent to pubescent aged boys engaging in sexual activity together; 3 videos depicting prepubescent and pubescent aged boys exposing their genitals and anuses, without other sexual activity; 14 videos depicting adults performing various sexual acts on prepubescent to pubescent aged boys; and 4 videos depicting minors performing oral sex on adult males.  Three of the files that I saw can be described as follows:

> **video_168@20-10-2025_30-34-14** depicts what a toddler boy, with an adult man attempting to penetrate his anus.  The boy cries.  The adult then ejaculates on his anus.

> **video_170@20-10-2025_03-34-14** depicts what appears to be a boy no older than 7 laying on his back with his knees hugged to his chest, and shorts pulled down

---

[2] I am familiar that in this context, "mega" means a "mega link."  That refers to the company Mega.nz, a data storage company located in New Zealand which is similar to Dropbox in the United States.  It is a popular and common thing for people interested in child pornography files to place them into a Mega account and provide or sell access to links to the account so that others can access and view child pornography.

around his ankles, exposing his penis and testicles. An adult male then ejaculates on the boy's genitals and anus. The boy appears to be holding a package of candy in his hand.

**video_179@20-10-2025_03-34-14** depicts a toddler age boy in a what appears to be a pack and play or crib, as there is a side barrier to the left of where the boy is laying. The bottom and side of the "bed" are covered in a blue and green plaid covering. The child is naked, and his anus is exposed. An adult hand digitally penetrates the child's anus, repeatedly, and then fondles the child's uncircumcised and under-developed penis, before returning to digital penetration.

### *Observations of De La Torre*



16.     On October 30, 2025, investigators observed De La Torre exit the residence located at ███████████ Mesa, Arizona, and enter the dark colored Acura MDX with AZ License Plate ███████ De La Torre traveled to Walmart, located at ███████ Mesa, Arizona and then Salad and Go located at ███████████ Mesa, Arizona, before returning to the residence on ███████

17.     On October 31, 2025, investigators again observed De La Torre exit the residence located at ███████████ Mesa, Arizona, and enter the dark colored Acura MDX with AZ License Plate ███████ Investigators followed De La Torre in the Acura as it traveled to ███████ at Scottsdale Fashion Square, located at ███████ Scottsdale, Arizona. Investigators observed him working in the men's section of the ███████ at Scottsdale Fashion Square mall on October 31, 2025.

18.     A search of the Department of Economic Security indicated that De La Torre is employed by ███████

19.     Between October 30-31, 2025, surveillance time of the ███████████ Mesa, Arizona residence, the surveillance team of investigators observed approximately 5 children going in and out of the home. All children were estimated to be elementary school age. An adult man (not De La Torre) was helping the children get onto a school bus. One child was in a wheelchair and he got off the school bus at around noon.

20.     On November 5, 2025, I was doing surveillance at the Scottsdale Fashion Square Mall in an attempt to further determined De La Torre's work schedule. I saw the Acura in the parking lot and I went into the store. I observed De La Torre working in the men's section, where he had been seen on October 31, 2025.

21.     The Acura is registered to ██████ De La Torre who I believe is De La Torre's ████ based on ██████████ and ████████ Lucas, who I believe may be a ████ based on the fact that he is ████████ of age of De Le Torre.  I am seeking to search the Acura because I am familiar, and have been involved in cases where, suspects have kept their devices in the vehicle which they drive and I am also familiar that persons who collect and keep child pornography will want to keep the files near to them so that others will not detect or discover their activities.

22.     Relevant to people living at the ████████████ Mesa, Arizona residence, I have located five AZ driver's records of adults who have their addresses at this location.  De La Torre is one of those adults.  Another of the adults is ████████████ ████ (i.e. the subscriber for the IP address from the receipt of child pornography to De La Torre in May 2025). Other AZ government records show that ████████████ has four minor children ages 12, 9, 3, and 2. ████████████████████████ ████████████████████████ A database available to law enforcement that looks at public records shows that a ████████████ is also an adult associated with the ████ ████████ Mesa, Arizona residence and he appears to be the father of four children ages 11, 7, 2, and 1, although each of those children may more regularly live with their mothers.

## COMPUTERS AND CELLULAR PHONES IN RELATION TO
## CHILD EXPLOITATION INVESTIGATIONS

23. *Probable cause*.  I submit that if a cellular phone, computer or computer storage media is found in the Residence, Vehicle, or De La Torre's person, outlined in Attachment A of these respective places, there is probable cause to believe those records will be stored on that cellular telephone, computer or computer storage media, for at least the following reasons:

a. Based upon my training and experience and in talking with other agents with experience in these types of investigations, I know that computers, including cellular telephones capable of connecting to the internet, basically serve five functions in connection with child pornography: access, production, communication, distribution, and storage. Cellular telephones easily connect to computers, and many or most social media applications can be accessed via a cellular telephone or via the internet on a computer. Many cellular telephone users regular back up their data to cloud storage or to their computers to keep room available on their cellular telephones.

b. A cellular phone, computer, or computer storage media ability to store images in digital form makes a cellular phone, computer, or computer storage media themselves an ideal repository for child pornography and other sexually related material involving children. Currently, a cellular phone can storage several hundreds (if not thousands) of computer files and hard disk drives can store hundreds of thousands of images, at very high resolution.

c. Collectors and distributors of child pornography frequently use online resources to retrieve and store child pornography including social media platforms and online storage accounts.

d. As is the case with most digital technology, communications by way of cellular telephones and computers can be saved or stored on the cellular telephone or retained on a computer used for these purposes. Storing this information can be intentional. Digital information, images and videos can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). Often, a cellular telephone or computer will automatically save electronic communications between its user and other users which have occurred over the Internet, and I know that these electronic chats often have great evidentiary value in child pornography investigations, as they record communications in transcript form, show the

date and time of such communications, and also may show the dates and times when images of child pornography were traded over the Internet. In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner often can recover evidence suggesting whether a computer contains peer-to-peer software, when the computer was sharing files, and some of the files which were uploaded or downloaded. Such information is often maintained on a computer for long periods of time until overwritten by other data, including days, months, or years.

e. Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.

f. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

24. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only files and data within cellular telephones, computers, and computer storage media that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how those cellular telephones, computers and computer storage media were used, the purpose of their use, who used them, and when. I am familiar that individuals often back up their cellular phone data to a cloud (off site storage on a server) or onto their own computer devices with more storage ability. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the Residence, Vehicle, or De La Torre's person, because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of

12

peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.

b. As explained herein, information stored within a cellular telephone, computer and other computer electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a cellular telephone, computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. And, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer and cellular phone evidence is not always data that can be merely reviewed by a review team and passed along to

investigators. Whether data stored on a computer or cellular phone is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

## SEARCH METHODOLOGY TO BE EMPLOYED

25. Based upon my knowledge, training, and experience in online child exploitation and child pornography investigations, as well as the experience and training of other law enforcement officers with whom I have had discussions, I have learned that it would be extremely difficult, if not impossible to conduct a *thorough* on-site review of all of the potential evidence regarding the cellular telephones, computers, and computer media, in this case.[3] Given these constraints, the search methodology to be employed is described below:

a. All cellular telephones, computers, computer hardware and any form of electronic storage that could contain evidence described in this warrant will be seized for an off-site search for evidence that is described in the attachments of this warrant. It is anticipated that mirror copies or images of such evidence will be made if the failure to do so could otherwise potentially alter the original evidence.

b. Consistent with the information provided within this affidavit, contextual information necessary to understand the evidence, to identify the user/possessor of the child pornography, and to establish admissibility of the evidence in subsequent legal proceedings will also be sought by investigative agents.

c. Additional techniques to be employed in analyzing the seized items will include (1) surveying various file directories and the individual files they contain; (2) opening files to determine their contents; (3) scanning storage areas, (4) performing key word searches through all electronic storage areas to determine whether occurrences of language

---

[3] I expect that on-site preview will be conducted, to the extent it is possible, to review cellular telephones, computers, and computer storage media that can be readily excluded from the purview of the warrant.

contained in such storage areas exist that are likely to appear in the evidence described in this affidavit and its attachments, and (5) performing any other data analysis techniques that may be necessary to locate and retrieve the evidence described in this affidavit and its attachments.

26.     Because it is expected that the cellular phones, computers, computer hardware and any form of electronic storage media may constitute (1) instrumentality of the offense, (2) fruit of criminal activity, (3) contraband, or (4) evidence otherwise unlawfully possessed, it is anticipated that such evidence will not be returned to the owner and that it will be either forfeited or ultimately destroyed in accordance with the law at the conclusion of the case.

a. Because of the large storage capacity as well as the possibility of hidden data within the cellular phones, computers, computer hardware and any form of electronic storage media, it is anticipated that there will be no way to ensure that contraband-free evidence could be returned to the user/possessor of the computer, computer hardware or any form of electronic storage media, without first wiping such evidence clean. Wiping the original evidence clean would mean that the original evidence would be destroyed and thus, would be detrimental to the investigation and prosecution of this case.

b. Further, because investigators cannot anticipate all potential defenses to the offenses in this affidavit, and as such, cannot anticipate the significance of the evidence that has been lawfully seized pursuant to this warrant, it is requested that all seized evidence be retained by law enforcement until the conclusion of legal proceedings or until other order of the court.

c.     If after careful inspection investigators determine that such computers, computer hardware and electronic storage media do not contain (1) instrumentality of the offense, (2) fruit of criminal activity, (3) contraband, (4) evidence otherwise unlawfully possessed, or (5) evidence of the person who committed the offense and under what circumstances the offense was committed, then such items seized will be returned.

d. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

### *Biometric Unlocking of Devices*

27. In *United States v. Payne*, 99 F.4th 495 (9th Cir. 2024), the Ninth Circuit held that the compelled use of the parolee / defendant's thumb to unlock his phone was not testimonial, comparing it to cases involving compelled samples of handwriting, voice, submitting to fingerprinting, or giving a blood sample for DUI testing. Based on my training and experience and that of other law enforcement agents assisting me, as well as from information found in publicly available materials published by device manufacturers, I know the following:

28. Many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

29. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through their fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. Additionally,

Apple offers Touch ID sensors on their MacBook Pros, enabling users the same convenience of unlocking their laptop with a fingerprint. The fingerprint sensors found on devices produced by other manufactures have different names but operate similarly to Touch ID.

30. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through their face. For example, this feature is available on certain Android devices and is referred to as "Facial Authentication." During the Facial Authentication registration process, the user holds the device in front of their face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufactures have different names but operate similar to "Facial Authentication." Some Apple devices are equipped with a similar feature.

31. If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with their irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers their irises by holding the device in front of their face. The device then directs an infrared light towards the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the recognized irises. Iris-recognition features found on devices produced by other manufactures have different names but operate similarly to "Windows Hello."

32. Users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and

thus have a heightened concern about securing the contents of a device.

33. As discussed above, I believe that one or more digital devices and/or computers will be found during the search. The passcode or password that would unlock the device subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

34. Biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Face ID when: (1) more than 48 hours have elapsed since the device was last unlocked; (2) the device has been turned on or restarted; (3) the passcode hasn't been used to unlock the device in the last six and a half days and Face ID hasn't unlocked the device in the last four hours; or (4) after five unsuccessful attempts to match a face or with Touch ID when the device has not been unlocked in more than 48 hours or the device was restarted. Similarly, certain Android devices cannot be unlocked with Facial Authentication if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

35. The person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, that person may not be the only user of the device whose fingerprints are among those that will unlock the device via biometrics, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on

the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require Brian De La Torre to unlock any electronic device requiring biometric access if that device is found during the search.

36.    Due to the foregoing, if law enforcement personnel locate any devices that are subject to seizure pursuant to this warrant in the Residence, Vehicle, and/or on De La Torre's person or in the possession or immediate control of De La Torre, that may be unlocked using one of the aforementioned biometric features, the proposed warrant would permit law enforcement personnel to: (1) press or swipe the finger (including thumbs) of De La Torre; (2) hold the device in front of the face of De La Torre and activate the facial recognition feature of the devices; and (3) hold the devices in front of the face of De La Torre and activate the iris recognition feature of the devices, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to demand these biometric features from anyone else in the residence or vehicle, or that any individual state or otherwise provide the password or any other means that may be used to unlock or access any device.

## CONCLUSION

37. Based on the foregoing, there is probable cause to believe that federal criminal statutes cited herein have been violated, and that fruits, evidence, and instrumentalities of these offenses are located at Residence, Vehicle, and person of De La Torre, listed in Attachment A of these respective warrants.

38. As stated above, I know that many individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect them from discovery, theft, or damage. They are collections that they value highly, protect, and access long after they acquire the images. Because of these factors, I believe that fruits, evidence, and instrumentalities of these offenses are located at the residence listed in Attachment A of the residential warrant; the Vehicle utilized by De La Torre, and on the person of De La Torre, described in Attachment A of these warrants.

39. Therefore, I respectfully request a search warrant be issued by this Court authorizing the search and seizure of the items listed in Attachment B of each warrant. I am aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence will also undergo a similar process. For this reason, the "return" inventory will contain a list of only the tangible items recovered. Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst. Further, I seek a warrant that authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

40. I also respectfully request an arrest warrant for Brian De La Torre supported by the facts set forth in this Affidavit for violations of 18 U.S.C. § 2252(a)(2) (knowingly distributing and receiving child pornography).

## REQUEST FOR SEALING

41. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant, and arrest warrant and its accompanying documents. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation, including identifying minors. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through forums. Premature disclosure of the contents of this affidavit and related documents may have a

significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

AMBER LYTTON

Digitally signed by AMBER LYTTON
Date: 2025.11.06 13:55:06 -07'00'

Amber Lytton
Special Agent
Federal Bureau of Investigation

Subscribed electronically and sworn to me telephonically this ____6____ day of November, 2025.

M Morrissey

HONORABLE MICHAEL T. MORRISSEY
United States Magistrate Judge